IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LARRY ORUTA, )
)
       Plaintiff, )
)
v. ) No. 05 C 1170
)
CENTRAL PLAZA HOME, B & D HOTEL )
CORPORATION, )
)
       Defendants. )

**MEMORANDUM OPINION AND ORDER**

This action is brought under Title VII of the Civil Rights Act of 1964 by Larry Oruta ("Oruta") against his former employer, B & D Hotel Corporation d/b/a Central Plaza Residential Home ("Central Plaza").[1] Oruta contends that while employed by Central Plaza, he was harassed and ultimately discharged because of his gender. Central Plaza has moved for summary judgment. For the following reasons, I grant Central Plaza's motion.

I.

Summary judgment is appropriate where the record and affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087,

---

[1] Oruta's complaint appears to name B & D Hotel Corporation and Central Plaza Home as separate defendants. However, there is no dispute that B & D Corporation does business as Central Plaza Residential Home, and that the two defendants are really one entity. For that reason, this opinion refers to both entities named in Oruta's complaint as one entity, "Central Plaza."

1090 (7th Cir. 1999); FED. R. CIV. P. 56(c). I must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Evidence presented in opposition to a motion for summary judgment must be admissible in content, though it need not be in an admissible form. *Payne v. Pauley*, 337 F.3d 767, 775 n.3 (7th Cir. 2003) (citing *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002)); *see also Juarez v. Menard, Inc.*, 366 F.3d 479, 484 n.4 (7th Cir. 2004) (noting that affidavits submitted in opposition to summary judgment must be based on personal knowledge such that they would be admissible at trial). This is an issue in this case because Oruta has presented a response to defendant's motion that, while notarized, contains unsupported assertions of fact. In addition, Oruta has presented unsworn documents purporting to be letters from individuals providing information relating to Oruta's claims. Oruta has not provided a response to defendant's Local Rule 56.1 statement of facts, and has not provided his own Local Rule 56.1 statement of facts. I cannot consider information provided by Oruta that does not comply with the local rules.[2]

---

[2] In addition to Oruta's initial response to defendant's motion for summary judgment, Oruta has filed pleadings entitled "Response to Summary Judgment 1st Amendment with Supportive Evidence," "Exhibits to Supportive Evidence for Summary Judgment Response 7-14-00," "Supportive Evidence to Summary Judgment Response," and,

2

II.

Taking all facts in the light most favorable to Oruta, and drawing all reasonable and justifiable inferences in his favor, the following are the undisputed facts relevant to this case: Central Plaza operates a long-term care facility (a nursing home) in Chicago. The facility provides services and care for individuals suffering from mental illnesses. Prior to taking a position with Central Plaza, Oruta worked as a counselor in the outpatient day program at Bobby E. Wright ("BEW"), a social service organization. As a counselor for BEW, Oruta had contact with officials at Central Plaza, and he contends that Murial Hanna ("Hanna"), the former Director of Social Services for Central Plaza, invited him to apply for a position there. Oruta testified that Hanna promised him that "she would start [him] with $30,000 and she would add on as time went by" and that Oruta would have a supervisory position at Central Plaza. Hanna and Gwendolyn Washington ("Washington"), Central Plaza's Administrator, interviewed Oruta and hired him on

---

after defendant filed its reply motion, Oruta filed a "Second Amendment to Response Motion to Summary Judgment and Supportive Evidence." Defendant objects to these pleadings because they were filed after Oruta filed a response to defendant's original summary judgment motion. While a party ordinarily must seek leave to file additional responses, I will construe Oruta's filings liberally and have examined them to determine if they present any disputes of material fact or present additional legal issues such that summary judgment would be inappropriate.

3

August 12, 2003. He began his employment with Central Plaza on August 12, 2003.[3]

Between August 12 and September 10, 2003, Oruta was employed both by BEW and by Central Plaza. Oruta claims that Hanna agreed to allow him to work concurrently for BEW until September 10 in order to complete his progress notes. Oruta testified that between August 12 and September 10 he went to BEW only "five or six days" in order to complete work there. Oruta testified that despite his agreement with Hanna, on September 10 she did not allow him to leave at 11:00 a.m. to go to BEW as promised. Instead, he was not able to arrive at BEW until 1:00, and as a result his relationship with BEW was strained.

Oruta was only employed by Central Plaza from August 12 until October 31, 2003. This is a period of 80 days, or slightly over 11 weeks. He was hired as a Program Coordinator. According to Oruta, he was hired to be the coordinator of a day program. This was a supervisory position, and Oruta stated that he supervised four women who were also counselors who ran groups. Oruta was

---

[3] Oruta contends that he and Washington signed a written agreement setting forth certain terms that would govern his employment, including his salary. He testified that Washington kept the agreement after he signed it. Central Plaza witnesses testified that Central Plaza does not use written employment agreements and that there was no written employment agreement with Oruta. Those same witnesses testified that Oruta was hired at a yearly salary of $30,000. Oruta himself testified, however, that he was to be paid at $15 per hour, which works out to slightly more than $30,000 per year.

4

responsible for ensuring that the groups were timely, the patients were in attendance, and that the counselors "did their notes" and complied with state requirements, including state inspections. Oruta also "coordinated at the same time for all the departments that were involved in social work and directly under [Hanna]."

Oruta contends that on one occasion Hanna required him to run a therapy group, even though this was not in his job description. Oruta testified that he told Hanna that he did not have materials to run the group, but that he would do his best. He testified that he ran the group with the one resident he was able to find, although he and Hanna disagreed about the group's topic and his presentation of the issues.

One of Oruta's central claims of discrimination is that he was denied overtime work when other employees were allowed overtime. Oruta claims that he was required to perform certain tasks and effectively work six days a week when women were not required to do so without receiving overtime pay. Oruta testified that Hanna told him that he was working too many hours and "deactivated [his] timecard several times to try to make a point." Oruta testified that he was entitled to between $1,400 and $2,000 because he did more than his timecards reflect. He further contends that a female Hispanic supervisory employee in the Dietary Department was allowed to work overtime, as was a Social Services employee named "Pat." A Central Plaza witness responded that the only female Hispanic

supervisory employee in the Dietary Department at the time Oruta worked for Central Plaza was Laura Feliciano, who was salaried. Likewise, a Central Plaza witness testified that the only woman named "Pat" who worked in the Social Services Department at the time Oruta was employed by Central Plaza was Patricia Hudson, an independent contractor who worked for Central Plaza as a licensed social worker. The Central Plaza witness testified that neither Hudson nor Feliciano received overtime or were given time off in lieu of overtime.

Oruta also claims that Central Plaza did not pay him as much as promised, although from the facts and argument he has submitted it is difficult to separate this argument from Oruta's contention concerning overtime. Oruta did admit in his deposition that he was paid six bi-weekly paychecks, each totaling $1,153.85. This rate of pay would equal wages of $30,000.10 per year. Oruta contends he should have been paid $15 per hour, which he contends would have raised his pay to slightly over $30,000. He also argues that Coquillette reduced his pay in August of 2003 so that his paycheck went from $486 to $320. He contends that he should have been paid "for 19 days of the month instead of just 10 days" although he does not explain why this is the case. In two letters that he wrote to Washington after he was terminated, he claimed his salary was reduced from $30,000 to $27,600, costing him "a lost of $800."

6

The other incident central to Oruta's claims is that he was unfairly required to complete a master list of what therapy groups each Central Plaza resident attended (the "master list"). Coquillette testified that Oruta was asked to provide this list on September 4, 2003, and that she personally explained the task to him and provided him with an example. She contends that Oruta was to provide a complete list by September 18, but that Oruta instead provided a list that was "incomplete, inaccurate, and not as requested."

Oruta presents an entirely different story. In a letter Oruta wrote to Washington on December 16, 2003, he claimed that the master list was never mentioned to him when he interviewed with Central Plaza or when he began work there on August 12, 2003. He also contends that he wanted to do the project but was unable to find an internal typist to prepare the list. He said he told Hanna that it would cost "$1500 to do this master list with the current people," and that Hanna suggested he go to Kinkos because "[t]hey will probably do it cheaper." Oruta testified that he went to several Kinkos and that the cheapest price he got was "almost a dollar a page" so that it would cost "like, $10,000." Oruta testified that Hanna would not spend this amount of money, so Oruta hired two non-Central Plaza employees to type the list, paying them himself. Oruta claims that he did finish a final list and gave it to Hanna, but she never gave the list to Coquillette. Oruta

further claims that the four women who worked with him wanted the previous master list because "it was easier for them" and that they were "able to influence [Hanna] and tell her [they] didn't want to do it, so she felt like she had to take their side of the story and sabatoge the project." Oruta contends that he complained to Washington that Hanna had promised there would be money available for the master list "but now there was no money for it." He testified that Washington said she would get back to him about that, but never did.

Oruta also generally contends that Hanna discriminated against him. He testified that Hanna stated that he "was trying to get her job, that [Oruta] told somebody that I wanted her job and she was going to fight me off." He also contends that although he met with Hanna regularly, she told Coquillette that Oruta "refused to communicate with her." He also said that Hanna told him "[you] think you have friends in this facility, you have no friends. If you're trying to complain to anybody, nobody is going to listen to you, because you don't have any friends. Everybody is going to report everything to me." Oruta also claims that in a meeting of supervisors in September of 2003, Hanna made a discriminatory comment, saying that "women - I shouldn't say this, but that women need men certain times, and they don't have enough of them in - I don't know if she meant to say in the facility or in general."

8

In his response to defendant's motion for summary judgment, Oruta makes other general allegations about discrimination at Central Plaza. He contends that men and not women were given evaluations, men but not women were reprimanded, women and not men were allowed to "choose days of work," women were given long lunches without limitations, and women were given freedom to "complete required assessments" and "rebel against authority." Oruta also cites to a "Deposition April 27, 2006" for the contention that "sexual remarks in the presence of all female staff" were made, although he does not explain how the deposition supports this contention.[4]

At the time Oruta was hired by Central Plaza, he signed a document that stated that all "'new' employees are on a 90 day probationary period." The document provided that "[t]ermination will result from . . . unsatisfactory performance of his/her job duties." Washington testified that she and Hanna made the decision to terminate Oruta. This decision was made because Oruta's job performance was unsatisfactory. The termination notice provided to Oruta stated that he was terminated for failing to update and revise program sheets, the master list, and resident schedules. He was also terminated because Hanna claimed that she observed him conduct a group without a lesson plan or materials and with only

---

[4]Neither side provided this court with a complete copy of Oruta's deposition, so I am unable to determine if this contention is supported by the record.

one resident present. Further, Oruta's termination notice stated that his duties included acting as a liaison between Central Plaza and other community agencies, but that Oruta did not follow up with agencies in a timely fashion.

Oruta contends that after his discharge, Central Plaza hired a female employee to replace him as program coordinator. Central Plaza witnesses testified that some of Oruta's duties were "absorbed" by an existing male employee who did not have a program coordinator title.

It is uncontested that Central Plaza has a policy regarding sexual harassment that provides, in part, that an employee who believes he is being sexually harassed "must immediately report such conduct to the facility's Administrator" or to the Regional Director of Operations for Central Plaza. Oruta testified that once he did try to get in contact with Washington to discuss his problems with Hanna, but Washington said she was busy and then left for vacation so he was not able to speak to her about it.

Following his discharge, Oruta filed a wage claim with the Illinois Department of Labor, claiming $2,410 from Central Plaza. He contended that he was owed $800 in overtime pay (30 hours at $18 per hour) that he was not paid, and that he had a "reduced salary" of $27,600. In his wage claim he also stated that his "rate of pay" at Central Plaza was $2,500 per month, or $30,000 per year.

This claim was dismissed,[5] and Oruta was instructed to make a minimum wage/overtime claim, which he subsequently did. On this claim form, Oruta stated that during his time at Central Plaza he worked 60 hours per week at $18 per hour, and that the amount he claimed is $2,000. That claim was also dismissed. Oruta did not appeal either of these decisions to the Department of Labor.

On July 19, 2004, Oruta filed a Charge of Discrimination with the Illinois Department of Human Rights, alleging that Central Plaza discriminated against him based on his sex.[6] Oruta claimed:

> During my tenure with [Central Plaza] I was subjected to continuous sexual remarks and hostile working environment by my female immediate supervisor. I was the only male supervisor under her direct supervision. On October 31, 2003, I was discharged from my position. . . . I believe that Respondent discriminated against me because of my sex, male, in violation of Title VII.

The Equal Employment Opportunity Commission issued Oruta a right to sue letter on November 24, 2004. Oruta then filed the present suit

---

[5] In a sworn affidavit, Marla Coquillette ("Coquillette"), an employee of Central Plaza who was responsible for quality assurance, testified that she attended a hearing on this claim and that an ALJ dismissed Oruta's non-overtime claim and notified Oruta that he could file a separate overtime claim.

[6] In the Charge of Discrimination (the "Charge") Oruta attached to his complaint, only the "Sex" box is checked in the section of the Charge indicating on what the purported discrimination is based. The "Sex" box is checked with a typewritten "X". However, the copy of the Charge Oruta attaches to his response to defendant's motion for summary judgment, in addition to an "X" in the "Sex" box, includes what appears to be hand-made check-marks in the boxes for "National Origin" and "Retaliation." I will rely on the copy of the Charge attached to Oruta's original complaint.

11

contending that defendant discriminated against him on the basis of his sex by terminating his employment and by "refus[ing] overtime work and also reduc[ing] salary originally promised." In his complaint Oruta claimed that Hanna "changed my daily duties. She added new directives plus daily harassments and threats to fire me. When I failed to show up in her office for social times then she used her accusation to terminate me."

### III.

In addressing Oruta's Title VII claim of discrimination on the basis of his sex, I must first determine whether Oruta has direct proof that Central Plaza discriminated against him, or whether he must rely on the indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Oruta has presented no direct evidence that any of the difficulties he had at Central Plaza were a result of his gender, and he has presented no "'convincing mosaic' of circumstantial evidence" that would allow an inference of intentional discrimination by a Central Plaza decision-maker. *See Jordan v. City of Gary, Indiana*, 396 F.3d 825, 832 (7th Cir. 2005) (citing *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Taking the facts alleged by Oruta as true, Central Plaza treated Oruta poorly, but there is simply no direct evidence that connects that mistreatment to Oruta's gender. Therefore, Oruta must proceed under the indirect method of proof.

To establish a prima facie case under that method, Oruta must show that he is a member of a protected class, he was performing his job satisfactorily, he suffered an adverse employment action, and that Central Plaza treated similarly-situated female employees more favorably than Oruta. *See O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). If Oruta can make this showing, then Central Plaza must provide a legitimate, non-discriminatory explanation for the actions it took against Oruta. *See Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003). If Central Plaza can provide such an explanation, then it is Oruta's burden to show that Central Plaza's explanation is pretextual. *See id.*

In addition to the general requirements under *McDonnell Douglas*, because he is a man Oruta must meet an additional burden. The Seventh Circuit has consistently held that it is "the unusual employer who discriminates against majority employees." *See, e.g., Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456-57 (7th Cir. 1999). For this reason, plaintiffs alleging reverse discrimination "must show background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [men] or evidence that there is something 'fishy' about the facts at hand." *Gore v. Indiana University*, 416 F.3d 590, 592-93 (7th Cir. 2005) (quoting *Phelan v. City of Chicago*, 374 F.3d 679, 684 (7th Cir. 2003)). In *Gore*, the Seventh Circuit used this "background circumstances" requirement to

13

determine that the plaintiff's Title VII claim must fail because the plaintiff had not shown that there was anything "suspicious" about the defendant's decision not to hire him. *See Gore*, 416 F.3d at 593. Here, taking the facts in the light most favorable to Oruta, Oruta cannot show such background circumstances. He has presented evidence that the majority of the employees he worked with were women, and that the decision-makers responsible for his firing were women. However, the same women who decided to terminate his employment during the probationary period were also the women who decided to hire him only eleven weeks earlier.

Even if Oruta could show such background circumstances, his claim does not satisfy the *McDonnell Douglas* test because he has not shown that similarly-situated female employees were treated differently than he was. To show that another employee is similarly situated to him, Oruta must show that "there is someone who is directly comparable to [him] in all material respects." *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). "[A] court must look at all relevant factors." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). These factors include "whether the employees 'dealt with the same supervisor' and were 'subject to the same standards.'" *Patterson*, 281 F.3d at 680 (quoting *Radue*, 219 F.3d at 617-18). Where the discrimination complained of concerns discipline or discharge, a plaintiff must show that another employee who was similarly

14

situated to the plaintiff "with respect to performance, qualifications, and conduct" was treated differently. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (citing *Radue*, 219 F.3d at 617).

The discrimination of which Oruta complains is (1) the change in his promised pay from $30,000 to $27,600, and from hourly pay to a salary; (2) being asked to perform tasks not in his job description (the master list and conducting a therapy group); (3) not being allowed to work overtime or receiving time off in lieu of overtime; (4) not being allowed to finish up his job at BEW as promised; (5) generally being reprimanded and criticized for his job performance; and (6) being terminated for false reasons. Oruta has not identified similarly-situated female employees who were treated differently than he was with respect to any of these incidents of discrimination. Oruta generally alleges that female employees were granted more privileges than male employees with respect to overtime, reprimands, and time off from work, but this is not enough to establish that these women were similarly situated. Oruta does allege that a female Hispanic supervisory employee in the Dietary Department was allowed to work overtime, as was a Social Services employee named "Pat." Oruta has only his own testimony to rely on for this contention, and he has not shown that his testimony is not inadmissible hearsay. Even assuming this testimony is admissible and true, Oruta has not shown that these

employees are similarly situated to him. One of these employees was in a different department and is therefore not similarly situated to Oruta. Central Plaza has presented evidence that "Pat," the employee in the Social Services department, was an independent contractor, and Oruta has not refuted this evidence. Oruta has also presented no evidence about what "Pat's" duties were and whether they were similar to his own. Oruta also testified that he did not know whether these two employees were hired on an hourly or a salary basis. The basis on which these employees were paid is critical to showing they were similarly-situated to him, since Oruta and Central Plaza agree that Oruta was being paid on a salary basis.[7] Because Oruta cannot show that any employees were similarly-situated to him, his Title VII claim fails.[8]

IV.

Although Oruta does not clearly articulate this claim in his response to defendant's motion for summary judgment, Oruta did claim in his complaint and in his deposition that he found the environment at Central Plaza to be "harassing"; his allegations can be interpreted as stating a claim under Title VII for a hostile

---

[7] Oruta argues that when he was hired he was to be paid on an hourly basis, but does agree that Central Plaza was actually paying him on a salary basis.

[8] Central Plaza also argues that the doctrine of issue preclusion prohibits Oruta from contesting the Illinois Department of Labor's findings that Central Plaza did not underpay Oruta or unfairly deny him overtime. Because I find Oruta cannot make a prima facie case under Title VII, I need not reach this argument.

16

work environment. A hostile work environment is one that "a reasonable person would find hostile or abusive." *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). A plaintiff must show that the hostile work environment was "based on" his protected status. *See Valentine v. City of Chicago*, 452 F.3d 670, 680 (7th Cir. 2006) (quoting *Velez v. City of Chicago*, 442 F.3d 1043, 1048 (7th Cir. 2006)). Here, taking the facts in the light most favorable to Oruta, and even assuming that his complaints about his treatment could amount to an environment that a reasonable person would find abusive, Oruta has presented no evidence from which a finder of fact could conclude that he was treated poorly because of his gender. Oruta does contend that on one occasion Hanna commented that "women . . . need men certain times, and they don't have enough of them . . . in the facility or in general." But this one ambiguous comment is not enough to connect Oruta's treatment to his gender. I therefore grant summary judgment to Central Plaza on Oruta's hostile work environment claim.

V.

In Oruta's response to defendant's motion for summary judgment, he raises for the first time the argument that Central Plaza violated the Equal Pay Act, 29 U.S.C.A. § 206(d) (2006), by requiring him to work long hours without overtime pay while female employees were either granted overtime or given days off to

compensate. This claim was not pled in his complaint, and normally a plaintiff may not amend his complaint in response to a motion for summary judgment. *See Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004). Regardless, even taking the facts in the light most favorable to Oruta, Oruta cannot establish this claim. The Equal Pay Act prohibits an employer from discriminating

> between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 U.S.C. § 206(d)(1). Here, Oruta has not shown that he was compensated less to perform work that required "equal skill, effort and responsibility" as set forth in the statute. He generally alleges he was required to complete additional tasks, but does not set forth facts that show that women receiving overtime or greater pay than he performed tasks requiring equal skill, effort, and responsibility. For these reasons, this claim is dismissed.

VI.

For the foregoing reasons, I grant defendant's motion for summary judgment, and plaintiff's claims are dismissed. I also dismiss any pending motions as moot.[9]

ENTER ORDER:

*Elaine E. Bucklo* (signature)

**Elaine E. Bucklo**
United States District Judge

Dated: October 17, 2006

---

[9] On September 1, 2006, Oruta filed with the court a document titled "Notification of Filing on already supportive evidence and presented subpoena To [sic] the Court on 6/7/2006." In this filing Oruta requests the Court hold Andrew Spotts in contempt for failing to respond to a subpoena served on BEW on June 2, 2006. I construe this as a motion to compel BEW to comply with the subpoena under FED. R. CIV. P. 37. Oruta attaches to this filing a copy of a subpoena served on BEW requesting documents from BEW including "Robert T. Monthly Progress Notes and Accident report October 24, 2003" and "Larry Oruta accident report September 3, 2003." Mr. Oruta did not provide BEW with a specific date or time by which to produce these records, and there is no evidence that these records would provide any evidence that would prevent me from granting defendant's motion for summary judgment, or that these records are relevant or would lead to discoverable evidence relating to Oruta's claims of discrimination. I therefore deny Oruta's motion to compel.